# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-10289

United States Court of Appeals
Fifth Circuit

**FILED**
June 26, 2018

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

> Plaintiff - Appellee

v.

DAVID LYMAN SPALDING,

> Defendant - Appellant

Appeals from the United States District Court
for the Northern District of Texas

Before DAVIS, JONES, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

David Lyman Spalding convinced about a hundred people—neighbors, strangers, and even his jeweler—to lend his companies millions of dollars. As Spalding put it, his ventures were poised to strike pay dirt; all they needed was a bit more cash. He obtained loans by promising rapid repayment and stock options, and by assuring that he would use the money for the business. In fact, Spalding spent much of it on himself. Eventually, an investor tipped the FBI, a grand jury indicted, and a petit one convicted. Spalding now appeals his convictions and sentences for various fraud and perjury charges. We affirm.

No. 16-10289

## I.

### A.

From about 2004 to 2010, Spalding founded and ran several companies, including Wind Plus Inc. and Wind Plus Holdings, Inc. (collectively, Wind Plus). Spalding billed these businesses to investors as seeking to sell energy projects, wind power, and wind-farm sites.

The pitch was simple: Wind Plus was about to go public and presented guaranteed returns. In exchange for loans, Spalding offered short-term promissory notes and potential stock options in the soon-to-be-public corporation. He also erected a pyramid scheme, pledging extra options to lenders who convinced others to chip in. Making overtures to some noteholders, Spalding falsely promised to use "a hundred percent" of their loans on Wind Plus's projects and legal fees. To others, he fabricated the scope of Wind Plus's designs and prospects.

Spalding also sent updates that swayed some backers to double down. He issued fake newsletters about Wind Plus's financing opportunities and third-party offers. He claimed to have entered valuable agreements that didn't exist. And he falsely described Wind Plus as shouldering only a "small amount of outstanding debt." Nevertheless, said Spalding, the company was "burn[ing] through cash" and required more capital to "cover[] legal and outside consulting expenses, secur[e] additional leases, and build[] overall momentum."

Reality painted a more sobering portrait. Wind Plus lacked a business plan and financial oversight. Burdened by scores of unpaid notes, the company swiftly incurred new expenses without compensating workers. At one point, Wind Plus Inc. failed to pay taxes and its corporate status lapsed. At another, Wind Plus saw its bank accounts dwindle to $4,000. Even its one success—a

2

No. 16-10289

$2.3 million return on the sale of a project site—occurred despite Spalding's refusing to pay for proper wind data.[1]

But as the firm floundered, its founder flourished. Wind Plus occasionally "advanced" Spalding sums ranging from $10,000 to $50,000 at a time. Spalding obtained $1,638,170 through wires and cashiers' checks, and another $485,525 in cash withdrawals. All told, he pilfered $2,123,695 from company coffers.[2]

Spalding, in fact, had no personal bank accounts; he just tapped Wind Plus's. In the year he informed investors that Wind Plus was "burn[ing] through cash," for example, his personal expenses comprised over one third of the company's expenditures. And Spalding masked his actions by transferring funds from Wind Plus's main account to a shell account, which he then used to replenish the main one after his assorted purchases.

What did he buy? A forensic accountant traced how investor funds covered Spalding's rent, utilities, homeowners' dues, taxes, groceries, dating services, and membership in a singles' vacation club. Spalding's more lavish spends included a home, Mercedes-Benz, yacht consultant, Caribbean vacation, $76,000 engagement ring,[3] six-figure wedding, and European honeymoon.

Tired of Spalding's "grandiose" but empty promises of repayment, one suspicious noteholder contacted the FBI. Others sued. Spalding then personally filed for Chapter 13 bankruptcy and sought to reorganize the Wind Plus companies under Chapter 11.

---

[1] The buyers originally offered $5 million, but withdrew that bid when they learned that Wind Plus had failed to do appropriate studies. Several Wind Plus workers besides Spalding salvaged the sale at $3.7 million.

[2] According to one government exhibit, the total was a dollar more. The parties do not assign the difference any import.

[3] Spalding also convinced the jeweler who sold him that ring to invest in Wind Plus.

No. 16-10289

Wind Plus's Chapter 11 filings drew skepticism. Spalding produced no financial records besides bank statements. And the records he did provide failed to blunt concerns. They "showed really unusual expenses" that, according to the Chapter 11 trustee, "weren't reflected in any . . . bankruptcy paperwork."

Thus Wind Plus's proceedings converted from Chapter 11 to Chapter 7—from reorganization to liquidation. Yet, when the Chapter 7 trustee asked for financial documents besides bank statements, Spalding provided none. (The trustee later learned that Spalding used Wind Plus's bank accounts instead of keeping his own.) Also odd was Spalding's claim that during his tenure he had pocketed only one year's salary, worth $42,000. Some amended filings further disclosed that Wind Plus had transferred—outside the course of ordinary business—Harry Winston jewelry and Ritz-Carlton sundries to Spalding's wife.

The bankruptcy proceedings proved pivotal not just for what Spalding put on paper, but also for what he said aloud. Spalding allegedly perjured himself during a creditors' meeting when asked to describe Wind Plus's noteholders.

Despite lender lawsuits and Wind Plus's bankruptcy, Spalding kept collecting new noteholders for yet another entity, Baseload Energy, LLC. He secured those loans through the familiar gambit. He promised to use the funds on things like the company's attorney's fees, confirmed that he would not take any salary until he got the latest project funded, and falsely claimed that he had secured a bank's "commitment to purchase 100 percent" of a venture. Spalding's speeches said nothing of bankruptcy, or lawsuits, or tax troubles, or his intent to use the loans to bankroll his personal life. Thus he continued to pocket the lenders' "investments."

4

No. 16-10289

The upshot: ninety-seven people gave Spalding $3,755,521. And instead of receiving quick and full repayment as promised, the few noteholders who recouped anything got pennies on the dollar.

**B.**

In its final superseding indictment, a federal grand jury charged Spalding with seven offenses: two counts of wire fraud (Counts One and Three),[4] one count of mail fraud (Count Two),[5] two counts of false testimony under oath (Counts Four and Five),[6] and two counts of bankruptcy fraud by false statement (Counts Six and Seven).[7] Spalding successfully moved to dismiss Count Seven on multiplicity grounds. He unsuccessfully moved to suppress statements he gave during a deposition in an investor's civil suit. That motion relied on the Fifth Amendment's privilege against self-incrimination, but the government disclaimed plans to introduce the deposition and the district court ruled the prior testimony fair game for impeachment.

The trial lasted seven days. Included on the government's witness list were some spurned investors, a forensic accountant, the bankruptcy trustees, and former Wind Plus workers. The investors described Spalding's representations, omissions, and failures to repay, and underscored that they would not have invested had Spalding been forthcoming about his past and plans. The forensic accountant traced activity on Wind Plus's six bank accounts to show how Spalding diverted company funds for personal expenses. The trustees testified about the bankruptcy proceedings and confirmed that Spalding's filings reflected his penchant for transferring Wind Plus funds outside the enterprise's "ordinary course of business." And the Wind Plus workers explained

---

[4] 18 U.S.C. § 1343.
[5] 18 U.S.C. § 1341.
[6] 18 U.S.C. § 152(2).
[7] 18 U.S.C. § 152(3).

5

how Spalding controlled the company but balked at spending money for business purposes. One Wind Plus consultant recalled how Spalding admitted his intent not to repay noteholders.

Though Spalding did not testify, he mounted a vigorous defense. His trial counsel cast him as an unwary and failed businessman who otherwise paid legitimate expenses. Several defense witnesses, however, belied that narrative. Wind Plus's former corporate counsel, for example, verified that Spalding "us[ed] funds that were invested in Wind Plus in part to pay personal living expenses." (Spalding waived whatever attorney-client privilege he may have enjoyed with Wind Plus's counsel.) Another former officer testified that Spalding "misled" him, and that the company's brass and investors alike "fell in the same trap." This witness also recounted how the board of directors eventually ousted Spalding, only to discover "nothing" to build on besides "[h]ot air." Another former colleague attested that Spalding hid company financials not just from investors, but from corporate officers, too.

The jury convicted on all six counts and the district court imposed a variant, below-Guidelines term of 180 months in prison.[8] The sentence required Spalding to pay restitution for $3,391,146.80 and to forfeit his house.[9] Spalding timely appealed.[10]

---

[8] The district court imposed 180 months on each fraud count and 60 months on each of the others, all to run concurrently. As we discuss below, Spalding argues that the district court applied the wrong Guidelines manual and miscalculated his sentencing range.

[9] Spalding does not independently challenge the court's forfeiture order. Rather, he maintains that "[i]f this case is remanded, the parts of the judgments relating to [forfeiture] should be reversed as well."

[10] While his appeal was pending, Spalding filed a pro se petition for a writ of certiorari before judgment. The Supreme Court denied that request. *Spalding v. United States*, 138 S. Ct. 1602 (2018).

No. 16-10289

## II.

We start with Spalding's sufficiency challenges. We give the evidence a de novo look, probing "whether, considering the evidence and all reasonable inferences in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Gibson*, 875 F.3d 179, 185 (5th Cir. 2017) (quoting *United States v. Vargas-Ocampo*, 747 F.3d 299, 303 (5th Cir. 2014) (en banc)). This is a "highly deferential" task, one requiring us to accept all credibility choices and reasonable inferences the jury made to support its verdict. *United States v. Chon*, 713 F.3d 812, 818 (5th Cir. 2013).[11] Spalding targets four of his six convictions.

### A.

First are the mail- and wire-fraud counts. The evidence sufficed to prove each.

Wire fraud comprises three elements: "(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Harris*, 821 F.3d 589, 598 (5th Cir. 2016); *accord* 18 U.S.C. § 1343. The same is true for mail fraud, except the second element involves "use of the mails," not wires, "to execute [the] scheme." *United States v. Lucas*, 516 F.3d 316, 339 (5th Cir. 2008) (quoting *United States v. Dotson*, 407 F.3d 387, 391–92 (5th Cir. 2005)); *accord* 18 U.S.C. § 1341. For both crimes, showing a "scheme to defraud" requires proof that Spalding "made some kind of a false or fraudulent material

---

[11] Spalding invokes the so-called "equipoise rule," asserting that we must reverse "if the evidence equally supports a finding of guilt or innocence." *Cf. United States v. Ortega-Reyna*, 148 F.3d 540 (5th Cir. 1998). That rule no longer governs, however. *See Vargas-Ocampo*, 747 F.3d at 301–02.

No. 16-10289

misrepresentation." *Harris*, 821 F.3d at 598 (quoting *United States v. Curtis*, 635 F.3d 704, 718 (5th Cir. 2011)).

At issue are the first and third elements: fraudulent scheme and specific intent. The government failed to show both, Spalding maintains, because Wind Plus did some legitimate business. He highlights "change[s] in market conditions" and his lack of "experience or discipline to run such a large operation." Spalding thus suggests that bad luck, not bad faith, explain the unpaid notes.

A rational jury could disagree. Regarding the fraudulent scheme, the evidence detailed a years-long con comprising patently fraudulent, material misrepresentations. Both government *and* defense witnesses confirmed Spalding's scheme to induce investments through deception. And no doubt Spalding's misrepresentations were material, for the victims consistently testified that they would not have cut Spalding checks had he been honest. As for his mental state, Spalding's concerted efforts to mask the ruse expose his specific intent to defraud. Consider, for instance, his fake updates, his reluctance to pay for business expenses, or his emails about Wind Plus's "cash burn" during his personal spending spree. Recall also that Spalding promised to take no salary and to use the victims' money on the business, but then funneled funds to himself. Or take the Wind Plus consultant (and defense witness) at his word: Spalding admitted his intention not to repay.

All that sustains the jury verdict on the mail- and wire-fraud counts.

### B.

The evidence similarly supported Spalding's conviction on Count Four— giving false testimony during a bankruptcy proceeding.

Federal law prohibits persons from "knowingly and fraudulently mak[ing] a false oath or account in or in relation to any case under title 11" of the Bankruptcy Code. 18 U.S.C. § 152(2). This crime has five elements: (1) a bankruptcy proceeding; (2) a statement made under penalty of perjury in that

proceeding; (3) the statement concerned a material fact; (4) the statement was false; and (5) the defendant made it knowingly and fraudulently. *United States v. Grant*, 850 F.3d 209, 214 (5th Cir.), *cert. denied*, 138 S. Ct. 257 (2017); *accord United States v. Marston*, 694 F.3d 131, 133 (1st Cir. 2012).

When asked in a creditors' meeting to "describe the noteholders and their relationship with the two Wind entities," Spalding said under oath:

> They signed promissory notes with the Wind Plus entity, the corporate parent in Canada, not the Wind Plus subsidiaries that we have shown are in Chapter 7 bankruptcy. A substantial amount of the notes, promissory notes were repaid. There was approximately 20 plus individuals that loaned money to the company. But those notes were back in 2004, 2005.

The indictment alleged that in those four sentences Spalding managed three falsehoods: (1) there were then over seventy individual noteholders, not "approximately 20 plus"; (2) only nine, not "a substantial amount" of those notes were repaid; and (3) the notes were not limited to 2004 and 2005.

Spalding insists that his statements were either opinions or literally true, and that therefore the government failed to prove falsity and criminal intent. He chiefly relies on *Bronston v. United States*, where the Supreme Court held that perjury statutes do not punish "an answer, under oath, that is literally true but not responsive to the question asked and arguably misleading by negative implication." 409 U.S. 352, 352–53, 362 (1973); *cf.* 18 U.S.C. § 1621.

This appeal is not the first time Spalding leveled his falsity and intent arguments; the jury heard and rejected them as well. We see no reason to disturb that sound judgment. Rational jurors could have found beyond a reasonable doubt that Spalding knowingly lied about the lenders' number, their repayments, and the relevant timeframe to "deceive or cheat [a] creditor [or] trustee." 5th Cir. Pattern Jury Instructions (Criminal) § 2.08(B) (2015). And the jury reasonably rejected Spalding's position that his answer was literally true

No. 16-10289

or expressed no facts. *See United States v. Nixon*, 816 F.2d 1022, 1030 (5th Cir. 1987) ("If in the natural meaning in the context in which [the defendant's] words were used they were materially untrue, perjury was established.").

Nor does *Bronston* aid Spalding. There, an examiner asked whether Bronston had ever owned a Swiss bank account, and Bronston's answer was orthogonal but "true and complete on its face": it accurately stated that Bronston's *company* had briefly banked with the Swiss. 409 U.S. at 354, 359. To support a perjury conviction, the government argued that Bronston misled with "literal truthfulness" that "unresponsively addressed" his company's affairs, "thereby implying that he had no personal Swiss bank account at the relevant time." *Id.* at 355. The Supreme Court reversed because perjury statutes do not punish "answers unresponsive on their face but untrue only by 'negative implication.'" *Id.* at 361. Rather, "any special problems arising from the literally true but unresponsive answer are to be remedied through the 'questioner's acuity' and not by a federal perjury prosecution." *Id.* at 362; *see also id.* ("[T]he examiner's awareness of unresponsiveness should lead him to press another question or reframe his initial question with greater precision.").

At best (from Spalding's perspective), *Bronston* is inapposite. Bronston's statement was evasive and facially true, Spalding's responsive and false—triply so. When asked to describe noteholders, Spalding lied about when, whether, and how many people either executed notes or got repaid. *See United States v. Schafrick*, 871 F.2d 300, 303 (2d Cir. 1989) ("If an answer is responsive to the question, then there is no notice to the examiner and no basis for applying *Bronston*.").[12]

---

[12] *Bronston* itself suggested that a case like Spalding's could support a perjury conviction, noting that "it is very doubtful that an answer which, in response to a specific quantitative inquiry, baldly understates a numerical fact can be described as even 'technically true.'" 409 U.S. at 598 n.3.

No. 16-10289

The jury was well within bounds to find Spalding guilty on this count.

## III.

Spalding also asserts that the district court erred in denying his motion to suppress some prior statements under the Fifth Amendment.[13] According to Spalding, a state court unconstitutionally compelled him to answer a disgruntled investor's questions during a deposition—testimony that the district court should have suppressed from his criminal case. This Fifth-Amendment claim is a nonstarter.

First, and on this record, the district court's decision denying Spalding's motion is unreviewable. Appraising suppression motions on appeal typically involves two steps: the merits (we afford factual findings clear-error deference but view legal conclusions de novo), and the injury (we ask whether the violation was harmless beyond a reasonable doubt). *See United States v. Mendez*, 885 F.3d 899, 907 (5th Cir. 2018). But attempting that second step here would be impossible because Spalding neither testified nor proffered what he would have said. *See United States v. Turner*, 674 F.3d 420, 434 (5th Cir. 2012) (denial of a Fifth-Amendment motion to suppress is unreviewable "without any record of what [the defendant] would have said" had he testified); *see also Luce v. United States*, 469 U.S. 38, 42 (1984); *United States v. Bond*, 87 F.3d 695, 700 (5th Cir. 1996).[14] We would have no way to measure the harm inflicted by the

---

[13] The Fifth Amendment guarantees that no one "shall be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, a right germane to both criminal and civil cases, *see Minnesota v. Murphy*, 465 U.S. 420, 426 (1984).

[14] Spalding recognizes that he "did not directly state that he would testify if the district court granted his motion to suppress," but claims that his "persistence in obtaining a ruling indicates that [he] would have testified if given the opportunity." That argument, however, invites us to do what *United States v. Bond* bars: to guess Spalding's motives and testimony. *See, e.g.*, 87 F.3d at 700 (holding that a defendant who neither testified nor proffered "failed to preserve [his Fifth-Amendment] issue for appellate review" and warning that "because 'an accused's decision whether to testify seldom turns on the resolution of one factor, a reviewing court cannot assume that the adverse ruling [on a suppression motion] motivated a defendant's decision not to testify'" (quoting *Luce*, 469 U.S. at 42)). We decline Spalding's invitation.

district court even if we agreed that Spalding's deposition testimony comprised compelled admissions.

There lies the second, independent problem with Spalding's claim: he was not "compelled" to speak at all. Generally, the Fifth-Amendment privilege "is not self-executing." *Roberts v. United States*, 445 U.S. 552, 559 (1980). "If a defendant desires the protection of the privilege, he must claim it or his statements will not be considered 'compelled' within the meaning of the Fifth Amendment." *United States v. Locke*, 482 F.3d 764, 767 (5th Cir. 2007).[15] Spalding, however, never invoked the Fifth-Amendment privilege during his deposition. The district court correctly denied his motion to suppress.

To be sure, we accept "even the most feeble attempt to claim a Fifth Amendment privilege." *United States v. Goodwin*, 470 F.2d 893, 902 (5th Cir. 1972). But a person's invocation must still be "timely," *Roberts*, 445 U.S. at 559, and "sufficiently definite to apprise the questioner"—or, in this case, a state-court judge—"of his intention," *Goodwin*, 470 F.2d at 902 (quoting *Quinn v. United States*, 349 U.S. 155, 164 (1955)).

Spalding did not timely indicate his intent to invoke his Fifth-Amendment privilege. He instead asserted a "contractual duty to maintain certain business information confidential" and attorney-client privilege under state law. *See Bradt v. Smith*, 634 F.2d 796, 800 (5th Cir. 1981); Fed. R. Evid. 501. Neither point flagged a Fifth-Amendment issue. Spalding therefore failed to alert his questioner or the state court that he wished to raise a constitutional shield.

Spalding's Fifth-Amendment challenge fails.

---

[15] The seminal *Miranda* decision is a "limited exception" to this rule. *See Roberts*, 445 U.S. at 560; *Miranda v. Arizona*, 384 U.S. 436 (1966). But *Miranda* does not apply here. However volatile Spalding's state-court litigation may have been, his deposition was not a custodial interrogation. *See United States v. White*, 589 F.2d 1283, 1285 (5th Cir. 1979).

No. 16-10289

**IV.**

Spalding also appeals the admission of several summary charts recapping Wind Plus's bank records. Those exhibits included a column or category relaying a forensic accountant's opinion that some expenditures funded Spalding's "personal expenses." Because the bank records themselves did not purport to identify business and personal expenses, Spalding asserts that the charts misrepresented the underlying records and misled the jury. He also charges the district court with failing to provide appropriate instructions. Any error was harmless.

"We review the admission of evidence, including summaries and summary testimony, for abuse of discretion." *United States v. Armstrong*, 619 F.3d 380, 383 (5th Cir. 2010). "If there is error, it is 'excused unless it had a substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* (quoting *United States v. Harms*, 442 F.3d 367, 375 (5th Cir. 2006)).

Federal Rule of Evidence 1006 offers one avenue for presenting charts at trial.[16] A party "may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006; *accord Harms*, 442 F.3d at 375 ("Rule 1006 applies to summary charts based on evidence previously admitted but which is so voluminous that in-court review by the jury would be inconvenient." (quoting *United States v. Taylor*, 210 F.3d 311, 315 (5th Cir. 2000)). Such charts are admissible when

> (1) they are based on competent evidence already before the jury,
> (2) the primary evidence used to construct the charts is available
> to the other side for comparison so that the correctness of the summary may be tested, (3) the chart preparer is available for cross-

---

[16] Rule 611 provides another path, permitting a party to use charts as "pedagogical device[s]," but not as substantive evidence. *Harms*, 442 F.3d at 375 (quoting *United States v. Buck*, 324 F.3d 786, 790 (5th Cir. 2003)). Because the district court admitted the charts as substantive evidence, we focus on Rule 1006.

No. 16-10289

examination, and (4) the jury is properly instructed concerning use of the charts.[17]

*United States v. Bishop*, 264 F.3d 535, 547 (5th Cir. 2001); *accord United States v. Lucas*, 849 F.3d 638, 644–45 (5th Cir. 2017). Because a chart admitted under Rule 1006 is substantive evidence, jurors may bring it to the deliberation room. *E.g.*, *Bishop*, 264 F.3d at 547.

Courts must be cautious with Rule 1006 charts. "[B]ecause summaries are elevated under Rule 1006 to the position of evidence," we have warned, "care must be taken to omit argumentative matter in their preparation lest the jury believe that such matter is itself evidence of the assertion it makes." *United States v. Smyth*, 556 F.2d 1179, 1184 n.12 (5th Cir. 1977); *accord* 2 McCormick On Evidence § 241 (7th ed. updated June 2016) ("[C]ourts must be scrupulous in assuring that the summary accurately portrays the contents of the underlying material" and thus "guard against summaries that contain . . . outright argument."); 31 Charles Alan Wright et al., *Federal Practice & Procedure: Federal Rules of Evidence* § 8043 (1st ed. updated Apr. 2018) (noting that charts "add[ing] matters not present in [the summarized] materials" might violate Federal Rule of Evidence 403). We have therefore found reversible error where the government "attempted to use a summary chart to prove an element that it otherwise had not established." *United States v. Ocampo-Vergara*, 857 F.3d 303, 310 (5th Cir. 2017); *see also United States v.*

---

[17] Our caselaw diverges on whether trial courts must offer a limiting instruction. In *United States v. Bishop*, we said that "[s]ummary evidence" admitted under Rule 1006 "should be accompanied by a cautionary jury instruction." 264 F.3d 535, 547 (5th Cir. 2001). In *United States v. Williams*, however, we wrote that a "summary chart that meets the requirements of Rule 1006 is itself evidence and no instruction is needed." 264 F.3d 561, 575 (5th Cir. 2001). But regardless whether cautionary instructions are *necessary*, they are in some cases *sufficient* to eliminate a summary chart's risk of unfair prejudice. *See, e.g.*, *United States v. Whitfield*, 590 F.3d 325, 365 (5th Cir. 2009) ("[T]he district court properly instructed the jury as to the limited purposes of summary charts, minimizing any risk of prejudice.").

No. 16-10289

*Hart*, 295 F.3d 451, 459 (5th Cir. 2002) ("The government *cannot* use a 'summary' chart under FRE 1006 'to assume that which it was required to prove beyond a reasonable doubt as operative facts of the alleged offense.'" (quoting *Taylor*, 210 F.3d at 316)).

Here, the exhibits' "personal expenses" categories presented not just summaries, but an expert's inferences and opinions about the underlying records. *See Smyth*, 556 F.2d at 1184 n.12 (warning of such exhibits); *cf. Hart*, 295 F.3d at 459 (similar). Although we have upheld the admission of similar summary exhibits, *see United States v. Means*, 695 F.2d 811, 817 (5th Cir. 1983); *United States v. Diez*, 515 F.2d 892, 905 (5th Cir. 1975), we need not decide that question because any error was harmless.

"The presence of an inference" in a summary chart is not per se "prejudicial." *Armstrong*, 619 F.3d at 384. No harm lies when the exhibit "does not suggest any conclusions unsupported by the evidence," *id.*, the district court properly instructs the jury, and the defendant conducts a "full cross-examination" of the charts' author, *United States v. Winn*, 948 F.2d 145, 159 n.36 (5th Cir. 1991); *see also Means*, 695 F.2d at 817 (chart "permissible" where "[t]he witness's conclusion constituted a fair assumption based on all the evidence, was subject to full cross-examination by defendants' attorneys, and the jury was instructed amply to give it only its due weight").

All three curatives are present. First, the facts supported the forensic accountant's assumptions. Although the bank records did not state explicitly that Spalding spent money on himself, no doubt his payments to vendors like a jeweler or a home-mortgage company were personal. And the expert "explained in [significant] detail how [s]he had derived figures contained in the summary charts from the underlying documents" and how the nature of each expenditure and vendor justified her otherwise admissible expert conclusions. *United States v. Jennings*, 724 F.2d 436, 442 (5th Cir. 1984); *see also* Fed. R.

15

No. 16-10289

Evid. 702. Second, the analyst testified to all of the same opinions aloud and the defense thoroughly questioned her and presented rebuttal evidence. Last, the district court properly cautioned the jury every time it admitted a challenged chart and in the final instructions.[18] And if there are any lingering doubts, recall that even the defense witnesses confirmed that Spalding "us[ed] funds that were invested in Wind Plus in part to pay personal living expenses."

Spalding is not entitled to relief.

## V.

We also reject Spalding's claim that the jury instructions were infirm. He advances three arguments: that the district court (1) misstated an element of wire fraud in Count One; (2) constructively amended the wire-fraud charge in Count Three by straying from the indictment's language; and (3) should have instructed that "literally true" statements cannot support a perjury conviction. None is persuasive.

---

[18] Each time the district court admitted a challenged chart, it gave the same instruction:

> [T]hese documents are summary documents of other records and express the conclusion of the witness based upon review of the documents underlying them how certain expenses should be categorized. It is up to you to determine if these summaries and conclusions are accurate. The best evidence of what occurred are the underlying records themselves.

We have endorsed similar instructions. *See, e.g.*, *Whitfield*, 590 F.3d at 365 n.29 (district court "properly instructed the jury" by saying, "[C]harts and summaries are valid only to the extent that they accurately reflect the underlying supporting evidence . . . . So these charts should be viewed in that manner, and you should give them only such weight as you think they deserve." (alterations omitted)). The district court's admonitions also accord with the pattern instruction for Rule 1006 evidence: "Certain charts and summaries have been received into evidence. You should give them only such weight as you think they deserve." 5th Cir. Pattern Jury Instructions (Criminal) § 1.44 (2015). Notably, the final jury charge parroted this pattern instruction.

**A.**

Spalding challenges his conviction on Count One because the district court omitted a word while listing wire-fraud's elements. The district court instructed that the jury could convict on that count only if "the scheme to defraud described in Count One employed false material representations, material pretenses, or false material promises." Because the word, "false," was missing before "material pretenses," Spalding urges us to vacate that conviction.

We ordinarily review jury instructions for abuse of discretion, examining whether "the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them." *United States v. Kay*, 513 F.3d 432, 446 (5th Cir. 2007) (quoting *United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002)). But Spalding did not raise this objection below. So he must point out plain error—a high hurdle, as he must show a clear, obvious, and forfeited error affecting his substantial rights. *See Gibson*, 875 F.3d at 195; Fed. R. Crim. P. 30(d). Even then, we will fix such error only if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1343 (2016) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).

Even if Spalding could satisfy plain-error's first two prongs, he would fail to show injury to his substantial rights. The wire-fraud statute and pattern instructions indeed mention "*false* or fraudulent pretenses." 18 U.S.C. § 1343 (emphasis added); *accord* 5th Cir. Pattern Jury Instructions (Criminal) § 2.57 (2015). But right before it listed the elements of Count One specifically, the trial court instructed the jury on wire fraud generally. That general instruction included the missing "false" and stated that the government "must [have] proved beyond a reasonable doubt . . . that the Defendant knowingly devised

17

No. 16-10289

or intended to devise a scheme by means of material *false* or fraudulent pretenses" (emphasis added). Consider also that the government proved one overarching scheme—the accusations differed only on the dates, victims, and means of interstate communication—and that the instructions on the other fraud counts mirrored the statute and pattern instructions, "false pretenses" and all.

Spalding's substantial rights remained unscathed.

## B.

The same plain-error prong resolves Spalding's next untimely argument. He says that the district court constructively amended the indictment on Count Three (the other wire-fraud charge) by changing the interstate-nexus element.[19] But the district court instructed the jury not to consider that element because Spalding and the government "stipulated that [it was] met." Spalding does not disavow that stipulation, so his substantial rights are intact.

## C.

Spalding further faults the trial court for rejecting one of his proposed instructions on the false-testimony counts. He reprises his *Bronston* arguments, contending that the district court should have instructed that a "literally true" statement cannot be fraudulent. *Cf. Bronston*, 409 U.S. at 352–53. We review for abuse of discretion, *United States v. Sheridan*, 838 F.3d 671, 672 (5th Cir. 2016), and see none here.

---

[19] An instruction constructively amends the indictment if it allows the jury to convict on "a factual basis that effectively modifies an essential element of the offense" or on "a materially different theory or set of facts [from] that [with] which the defendant was charged." *United States v. Nanda*, 867 F.3d 522, 529 (5th Cir. 2017) (alterations omitted) (quoting *United States v. Chaker*, 820 F.3d 204, 210 (5th Cir. 2016)), *cert. denied*, 138 S. Ct. 1578 (2018). Because Spalding never raised this argument below, we review it for plain error, *see United States v. Stanford*, 805 F.3d 557, 565 n.2 (5th Cir. 2015), even though we have previously held that constructive amendments warrant "automatic reversal," *see United States v. Bohuchot*, 625 F.3d 892, 897 & n.12 (5th Cir. 2010).

No. 16-10289

Failing to give a defendant's suggested instruction is an abuse of discretion if the proposal is (1) substantively correct, (2) not "substantially covered" in the jury charge, and (3) concerns "an important point in the trial so that the failure to give it seriously impairs the defendant's ability to present effectively a particular defense." *Id.* at 673 (quoting *United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005)). We will not reverse, however, if the jury charge nevertheless tracks the Fifth Circuit Pattern Instructions and correctly states the law. *Id.*

The district court did not err. Its charge substantially covered Spalding's point by instructing that a "statement that is true cannot be fraudulent." And again, *Bronston* was inapposite, so the instructions needed not dive deeper. Nor did the jury charge hamper Spalding's ability to air his defense that he made "literally true" statements. The jurors heard and rejected that view.

There was no instructional error.

## VI.

Spalding also contests his sentence. He relinquished most of his arguments. The rest reveal no procedural error.

We assess criminal sentences "using a two-step abuse-of-discretion standard." *United States v. Scott*, 821 F.3d 562, 567 (5th Cir. 2016). At step one, we gauge whether the sentencing court committed a "significant procedural error such as improperly calculating the Sentencing Guidelines range." *Id.* Step two requires us to review the sentence for "substantive reasonableness." *Id.*

19

No. 16-10289

**A.**

Spalding's principal objection is that the district court used the wrong Guidelines manual for his fraud convictions. He contends that the 2015 manual—instead of the more-draconian 2014 version[20]—should have controlled because it took effect months before his sentencing.

But Spalding surrendered this argument. The district court first set sentencing for July 2015, when the 2014 manual still applied. Spalding then sought and secured several continuances, the last of which he requested in late October 2015—three days before the new manual took over. The court granted that continuance on one condition: that "the guidelines in effect [on October 29, 2015] will be applied by the court in connection with a continuance; not the guidelines that are taking effect after today." Spalding's counsel agreed: "I would not argue as a matter of law that they had to be applied. . . . I will not argue the November '15 guidelines are legally—you're legally required to apply those." We will not review on appeal the very argument Spalding renounced below. *See United States v. Ruiz-Arriaga*, 565 F.3d 280, 282–83 (5th Cir. 2009) (finding waiver where "defense counsel affirmatively represented to the district court a sentencing range that appellate counsel now disavows").

Spalding's riposte is that this issue is unwaivable. After all, he writes, federal law says a district court "*shall*" use the Guidelines manual "in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(4) (emphasis added). Spalding reads this directive to leave district courts no discretion.[21]

---

[20] The 2014 manual set Spalding's sentencing range at 210–262 months. The 2015 version would have dropped it to 135–168 months.

[21] At oral argument, Spalding suggested that even were the right waivable, the defendant would have to participate personally in the waiver. *Cf. Olano*, 507 U.S. at 733 ("[W]hether the defendant must participate personally in the waiver . . . depend[s] on the right at stake."). Spalding waived this argument, too, because he never briefed it, *see United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010), and, regardless, Spalding's position

No. 16-10289

The word, "shall," cannot bear the weight Spalding assigns it. Inflexible focus on "shall" would read the Constitution itself as forbidding bench trials and guilty pleas. *Cf.* U.S. Const. amend. VI ("In *all* criminal prosecutions, the accused *shall* enjoy the right to a speedy and public trial, by an impartial jury . . . ." (emphases added)). Yet, it is well-settled that a "criminal defendant may knowingly and voluntarily waive many of the most fundamental protections afforded by the Constitution." *United States v. Mezzanatto*, 513 U.S. 196, 201 (1995); *accord Olano*, 507 U.S. at 733 ("[A] defendant who knowingly and voluntarily pleads guilty in conformity with the requirements of Rule 11 cannot have his conviction vacated by a court of appeals on the grounds that he ought to have had a trial."). The same goes for statutory rights: "absent some affirmative indication of Congress' intent to preclude waiver," we must "presume[] that statutory provisions are subject to waiver by voluntary agreement of the parties." *Mezzanatto*, 513 U.S. at 201. We spot no Congressional signal forbidding waiver here. And because defendants may waive their rights to appeal their sentences generally, *e.g.*, *United States v. Jacobs*, 635 F.3d 778, 780–81 (5th Cir. 2011), such waivers necessarily include claims of Guidelines error, *see Ruiz-Arriaga*, 565 F.3d at 282–83.

It follows that Spalding's right to be sentenced under the 2015 Guidelines was waivable.[22] The district court did not err in accepting the unequivocal waiver here.

---

would likely fail on the merits, *see Ruiz-Arriaga*, 565 F.3d at 282–83 (finding Guidelines waiver based on defense counsel's statements).

[22] We are not alone in holding defendants to their bargain when they agree to use an otherwise inapplicable Guideline. *See, e.g.*, *United States v. Riggi*, 649 F.3d 143, 148–50 (2d Cir. 2011) (enforcing appellate waiver despite ex post facto issue); *United States v. Collier*, 585 F.3d 1093, 1096 (8th Cir. 2009) (finding waiver where defense counsel agreed to apply an outdated, mandatory Guidelines manual); *United States v. Magouirk*, 468 F.3d 943, 951 (6th Cir. 2006) (similar); *cf. United States v. Gilcrist*, 106 F.3d 297, 302 (9th Cir. 1997) ("[W]e cannot consider [the defendant's] ex post facto argument because [he], at the sentencing hearing, expressly agreed to the use of the Guidelines Manual in effect at the time of sentencing.").

21

No. 16-10289

## B.

We next consider whether the district court properly calculated the advisory sentencing range under the 2014 manual. Spalding says the district court erred by applying the "sophisticated means" enhancement under U.S.S.G. § 2B1.1(b)(10)(C) (2014). He preserved this argument, so we review it for clear error. *See, e.g.*, *United States v. Charroux*, 3 F.3d 827, 836 (5th Cir. 1993) ("We review for clear error the district court's factual finding that the defendants used sophisticated means to conceal their offenses."). "The court will find clear error . . . 'only if, based on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed.'" *United States v. Nava*, 624 F.3d 226, 229 (5th Cir. 2010) (quoting *United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006)). "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole." *Id.* (quoting *Rose*, 449 F.3d at 633).

Spalding's conduct lands squarely within the Guideline's grasp. The 2014 commentary[23] defines "sophisticated means" as

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. . . . Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

§ 2B1.1 cmt. n.9(B). Although Spalding insists that "some complexity will always be required" to commit fraud, here he is far too modest. To name just a few salient acts: he siphoned money by maintaining a foreign corporation and

---

[23] "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

22

No. 16-10289

used six corporate bank accounts, one of which was a shell through which he masked his expenditures. *Cf. id.*[24]

There was no mistaking Spalding's sophistication.

## C.

The district court also increased Spalding's offense level under U.S.S.G. § 2B1.1(b)(19)(a) (2014),[25] concluding that Spalding violated securities law and should have registered as a broker. Again we find waiver.

Spalding's appellate counsel claims error. But trial counsel said the opposite: "I can't argue, based on my review of the Securities Act, that Mr. Spalding shouldn't have, under a technical reading of the Act, been registered as a broker." Indeed, trial counsel informed the district court that applying § 2B1.1(b)(19)(a) would be "technically correct." He then advocated for a variance outside of the Guidelines because "there are . . . degrees of engaging in brokering" and "Spalding [was] at the very bottom of that scheme in that he was only selling his own product." That waiver forecloses our review. *See, e.g.*, *United States v. Rodriguez-De la Fuente*, 842 F.3d 371, 374 (5th Cir. 2016) ("Waiver extinguishes an error, taking it out of Federal Rule of Criminal Procedure 52(b), and thus [w]aived errors are entirely unreviewable." (citations omitted)).[26]

---

[24] Spalding's reliance on *United States v. Valdez*, 726 F.3d 684 (5th Cir. 2013) is therefore misplaced. In *Valdez*, we held the sophisticated-means enhancement inapplicable because the defendant simply "took money directly deposited from Medicare into his operating account, which as in his name, and moved it into his investment accounts, which were also in his name." *Id.* at 695.

[25] This Guideline calls for a four-level increase if the offense involves "a violation of securities law and, at the time of the offense, the defendant was . . . a registered broker or dealer . . . or . . . an investment adviser." U.S.S.G. § 2B1.1(b)(19)(A). The probation office reasoned that "[t]he legal definition of 'registered broker' and 'investment advisor' includes someone who is required to register. Because the defendant was selling promissory notes, he should have . . . registered." *Cf.* 15 U.S.C. §§ 78c(a)(48), 78o(a)(1).

[26] For the first time at oral argument, Spalding posited that his waiver was equivocal. We disagree. But even were we to credit Spalding's belated assertion, Spalding's statements

23

**D.**

Last, Spalding asserts that the district court arrived at the wrong Guidelines range by overstating the losses he caused. He argues that the district court should have credited him for services rendered—namely, money spent on "legitimate business expenses."

Determining the loss amount is a fact-finding we review for clear error. *United States v. Brown*, 727 F.3d 329, 341 (5th Cir. 2013). For fraud cases, the Guidelines require district courts to calculate the "greater of actual loss or intended loss" resulting from the offense; higher losses trigger higher offense levels. U.S.S.G. § 2B1.1(b)(1) & cmt. n.3(A) (2014). An "actual loss" is "the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* cmt. n.3(A)(i). An "intended loss" is "the pecuniary harm that was intended to result from the offense." *Id.* cmt. n.3(A)(ii). Either way, the sentencing court must lower the amount by any "money returned" or "the fair market value of the property returned and the services rendered . . . to the victim[s] before the offense was detected." *Id.* cmt. n.3(E)(i). "The district court need only make a reasonable estimate of the loss, and, given the unique position it occupies to assess the loss amount, its loss calculation is entitled to appropriate deference." *Brown*, 727 F.3d at 341 (citations omitted).

The district court cut Spalding's loss amount by the small sum he repaid investors. The court pegged the remaining loss at $3,391,146.80.[27] That was correct. No further discounts were warranted because Spalding returned his

---

would either trigger the invited-error doctrine or the plain-error one. *See United States v. Rodriguez*, 602 F.3d 346, 350–51 (5th Cir. 2010). He satisfied neither.

[27] Spalding also contends that the government failed to show he "had the subjective intent to cause $3,391,146.80 in loss to the investors." That argument ignores that the district court used the *actual* loss figure—the amounts investors loaned because of Spalding's misrepresentations, less the amounts Spalding repaid. *See* U.S.S.G. § 2B1.1 cmt. nn.3(A)(i), (E)(i) (2014).

victims nothing else of value, notwithstanding his putative "legitimate business expenses."

We find persuasive the Second Circuit's answer to this question. *See United States v. Byors*, 586 F.3d 222 (2d Cir. 2009) (applying a substantially similar version of § 2B1.1). In that fraud case, John Byors, like Spalding, tricked investors into lending him money for a business. *Id.* at 224. Byors, like Spalding, "represent[ed] to investors that their money would be used for business-related purposes." *Id.* Byors, like Spalding, "used substantial amounts of the borrowed funds to make down payments on houses," "to purchase automobiles," and "for a variety of other personal expenditures." *Id.* And Byors, like Spalding, argued at sentencing that his "legitimate business expenditures" should defray the loss amount "as 'services rendered' to the victims." *Id.* at 226. The Second Circuit disagreed: "The Guidelines do not require a loss to be offset by any legitimate expenditures, as defendant argues, but rather by 'value' that has been conferred on victims in the form of money or property returned or services rendered." *Id.* And because Byors's "expenditures, legitimate or not, conferred nothing of value and no benefit on his victims," he "rendered no 'services' to them and failed to deliver any return on their 'investment.'" *Id.*

So, too, for Spalding. His investors (other than the few he repaid) received no value or benefit from business expenditures prolonging the fraud. *See id.*[28] Neither does Spalding argue that the promissory notes themselves

[28] *See also, e.g.*, *United States v. Foster*, 878 F.3d 1297, 1306 (11th Cir. 2018) (no offset where defendant's defrauded investors "would be unable to sell whatever interest they did have"); *United States v. Evans*, 744 F.3d 1192, 1198 (10th Cir. 2014) (no offset for "services rendered" that "provided no ultimate benefit to the investors and prolonged the fraud"); *United States v. Craiglow*, 432 F.3d 816, 820 (8th Cir. 2005) (rejecting "the argument that one who commits a fraud is entitled to his business expenses" in "perpetrating" the crime (quoting *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998)); *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998) (no offset for refunds "done for the sole purposes of deflecting serious disruption of [the defendants'] schemes and making the operation look legitimate"); *United States v. Marvin*, 28 F.3d 663, 665 (7th Cir. 1994) ("Even if we could agree

No. 16-10289

are worth anything. *Cf. United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008). The district court thus did not err in refusing to reduce the loss amount beyond what Spalding refunded.

\*        \*        \*

AFFIRMED.

---

that these expenditures were 'legitimate' as [the defendant] claims, they nevertheless were intertwined with and an ingredient of [his] overall fraudulent scheme. . . . The monies he spent as part of his fraudulent scheme do not become 'legitimate business expenses' simply because other legitimate businesses also incur these expenses.").