# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-30033

United States Court of Appeals
Fifth Circuit

**FILED**
June 5, 2015

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

VERNA S. AGE; LOUIS T. AGE,

Defendants - Appellants

Appeals from the United States District Court
for the Middle District of Louisiana
USDC 3:11-CR-105-4

Before STEWART, Chief Judge, HAYNES, Circuit Judge, and BROWN, District Judge.[*]

PER CURIAM:[**]

This appeal arises from a Medicare fraud scheme, spanning over six years. Defendant Louis Age (Louis) was the owner and operator of a home health care business. Defendant Verna Age (Verna) served as the Director of Nursing for the company. Together with Ayana Alverez (Alverez), Louis's

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.
[**] Pursuant to 5th Cir. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

No. 13-30033

daughter, Louis and Verna paid kickbacks to patient recruiters to obtain Medicare beneficiary information and to medical doctors to sign fraudulent referrals, falsified qualification documents to make it appear that these beneficiaries qualified for home health services, and used false documents and beneficiary information to receive over $17.1 million in reimbursements from Medicare.  Louis and Verna make various evidentiary challenges to their convictions for conspiracy to commit health care fraud and conspiracy to pay illegal kickbacks.  We AFFIRM.

I.

Louis owned South Louisiana Home Health Care, Inc. (SLHH), a home health care business that provided home health care and skilled nursing services to Medicare beneficiaries.  He operated SLHH with his former wife, Verna, a registered nurse, who served as the Director of Nursing.  Alverez began working for SLHH in 2005 as an assistant administrator.  In 2007, Louis turned over the day-to-day operations of the business to Alverez but remained in charge of how things would be run at the company.  From 2005 to 2011, Louis, Verna, and Alverez engaged in a family-run scheme, in place before Alverez joined the business, to commit Medicare fraud by paying physicians to sign referrals, admitting patients who didn't need home health care services, and paying patient recruiters to bring them patients.  Louis taught Alverez how to manage the physician referrals and patient recruiters, while Verna taught Alverez how to manage the Medicare paperwork. Louis, Verna, and Alverez received the money from the scheme and used it to fund lavish lifestyles.

From 2005 to 2011, Medicare reimbursed SLHH $17.1 million for home health services. From 2007 to 2010, Verna received over $347,000 in direct payments from SLHH bank accounts. Over the same time period, Louis received over $866,000 in direct payments from the corporate bank accounts.

2

No. 13-30033

Louis, Verna, and Alverez had corporate credit cards and signature authority on the corporate bank accounts, and used those funds for real estate purchases, trips, concerts, dinners, movies, jewelry, shopping, and other personal expenses. The credit card bills, which were paid using funds obtained by SLHH from Medicare, amounted to over $2.6 million from 2007 to 2011.[1]

On August 31, 2011, a grand jury returned a multi-count indictment charging Louis and Verna, along with several others, including Alverez and Milton Womack (Womack), a patient recruiter.  Count 2 charged Louis and Verna, along with Alverez and Womack for, *inter alia*, conspiracy to violate the Anti-Kickback Statute in violation of 42 U.S.C. § 1320a–7b.  *See* 18 U.S.C. § 371.

On August 9, 2012, the grand jury returned a superseding indictment, adding Louis and Verna as defendants on the Count 1 conspiracy to commit health care fraud charge.  Verna was also added to the Count 3 false statements charge.  Louis and Verna remained charged in Count 2.  Womack, who had died, was not charged in the superseding indictment.

Trial commenced against Louis and Verna on October 1, 2012, with several coconspirators, including Alverez, testifying for the government.  The jury hung on Counts 1 and 2 against Louis and on Count 1 against Verna; the court declared a mistrial on those charges.  The jury convicted Verna on Count 2 and acquitted her on Count 3.

---

[1] In the fall of 2011, Louis, Verna, Alverez, and others involved with SLHH were indicted in this case. Verna asked Alverez, who is not Verna's biological daughter, to lie to the government and take all responsibility for the scheme. In return, Verna stated that she and Louis would raise Alverez's daughters while Alverez was in jail and then take care of Alverez when she was released.  Although Louis initially did not agree with Verna's suggestion, a few weeks later he too asked Alverez to plead guilty, but maintains that he and Verna were not involved in any criminal conduct. Alverez initially agreed in order to please her father, but later decided that she needed to tell the truth and therefore pled guilty to the indictment, without a plea agreement, and made a statement that "my dad and Verna ran the scheme with me."

No. 13-30033

A second trial on the Count 1 health care fraud conspiracy charge against both Louis and Verna and the Count 2 illegal kickback conspiracy against Louis commenced on March 22, 2013. The jury convicted both defendants on Count 1 and convicted Louis on Count 2.

The court sentenced Louis to 120 months of imprisonment on Count 1 and to a consecutive 60-month sentence on Count 2, for a total of 180 months, to be followed by three years of supervised release. Verna was sentenced to concurrent prison terms of 60 months on each count, to be followed by two years of supervised release. The court held them jointly and severally liable for $17.1 million in restitution. It also imposed a forfeiture money judgment on both defendants totaling more than $9.2 million.

## II.

We review sufficiency of the evidence claims *de novo* but "in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction." *United States v. Gulley*, 526 F.3d 809, 816 (5th Cir. 2008).[2] We review the district court's findings of fact for clear error. *See State Marine Corp. v. Ocean Line of Azores, Inc.*, 41 F. 3d 664 (5th Cir. 1994).

## III.

Verna and Louis both challenge their convictions, and we address each claim in turn.[3] Verna first contests the sufficiency of the evidence of her

---

[2] Because Verna failed to renew her motion for acquittal at the close of all of the evidence, this Court "consider[s] the entire record" in evaluating her sufficiency claim and is not limited to the government's case in chief. *United States v. Alarcon*, 261 F.3d 416, 425 (5th Cir. 2001).

[3] Verna also makes numerous, undeveloped claims of prosecutorial misconduct, but because she failed to raise them at the district court, these arguments are waived. *See United States v. Juarez-Perez*, 213 F. App'x 273, 274–75 (5th Cir. 2007) (citing *United States v. Pope*, 467 F.3d 912, 920 (5th Cir. 2006)).

convictions.  However, "there is substantial evidence from which a rational trier of fact would have to find [Verna guilty] . . . beyond a reasonable doubt." *United States v. Alarcon*, 261 F.3d 416, 425 (5th Cir. 2001).

Next, Verna argues that her acquittal in the first trial on the Count 3 false statements charge precludes the guilty verdict in the second trial on the Count 1 health care fraud conspiracy, as it would violate the Double Jeopardy Clause.  However, that claim, too, is without merit.  The defendant bears the burden of proving that "the issue whose relitigation [she] seeks to foreclose was actually decided in the first proceeding," and Verna did not do so.  *United States v. Whitfield*, 590 F.3d 325, 371 (5th Cir. 2009) (internal quotation marks omitted) (quoting *Dowling v. United States*, 493 U.S. 342, 350 (1990)).  Count 3 in the first trial was a substantive charge that Verna made false statements regarding one specific Medicare beneficiary, but Count 1 in the second trial charged Verna with engaging in a conspiracy to commit health care fraud, not substantive fraud.  Proof of the conspiracy did not demand proof that Verna made any false or fraudulent statements; instead, the conspiracy count required proof only of an agreement to engage in health care fraud.  Thus, "[b]ecause the first jury could have rationally based its verdict" on the Count 3 false statements charge "on an issue apart from the facts necessary for a determination of guilt on [C]ount 1, the retrial was not barred by [the Double Jeopardy clause]."  *United States v. El-Mezain*, 664 F.3d 467, 555 (5th Cir. 2011).

Verna next challenges the loss amount attributed to her by the district court because there was no allowance made for any legitimate services that may have been rendered.  Verna received a 20-level enhancement because the district court held her responsible for a loss of $17.1 million, the total amount of the claims submitted to Medicare.  *See* U.S.S.G. § 2B1.1(b)(1)(K).  However, she failed to present any evidence of legitimate services.  *See United States v.*

5

*Hebron*, 684 F.3d 554, 563 (5th Cir. 2012) ("[W]here the government has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate. Otherwise, the district court may reasonably treat the entire claim for intended benefits as intended loss.").

Both Louis and Verna make claims regarding the district court's disqualification of Hilliard Fazande from serving as Louis's counsel at the second trial based on a potential conflict of interest. Louis claims that the district court erred by disqualifying Fazande, and Verna claims a violation of her Sixth Amendment rights related to the disqualification. Both claims are meritless. There was overwhelming record evidence of Fazande's actual and potential conflicts of interest, including, *inter alia,* his title as SLHH's general counsel during the charged conspiracy and the grand jury investigation involving Fazande, which is related to the conduct at issue in the instant case. Further, while a defendant may waive a conflict of interest, "the district court is allowed 'substantial latitude' to refuse such waivers in cases of either actual or potential conflict." *United States v. Sanchez Guerrero*, 546 F.3d 328, 332 (5th Cir. 2008) (quoting *Wheat v. United States*, 486 U.S. 153, 163 (1988)). Verna, however, has no standing to challenge Fazande's disqualification, as the Sixth Amendment right to counsel is "personal to [Louis]." *Texas v. Cobb*, 532 U.S. 162, 171 n.2 (2001).

Lastly, Louis claims that the district court erred under Fed. R. Evid. 404(b) in allowing the prosecutor to ask questions "that suggested that Mr. Age was responsible for the murder of Milton Womack," as the evidence sought to be admitted was irrelevant "other crimes evidence." He further argues that even if it were relevant, it should be excluded for being more prejudicial than probative. A review of the record, however, demonstrates no prejudicial error,

particularly in light of the overwhelming evidence of Louis's guilt regarding the health care fraud charges. *See United States v. Limones*, 8 F.3d 1004, 1008 & n.2 (5th Cir. 1993) (finding no reversible error where government witness mentioned that defendants stated they had killed coconspirator in light of the "significant evidence" of defendants' guilt on the drug charges).

At the first and second trials, there was testimony, without objection, that Womack was deceased. Further, the evidence showed that Fazande, Louis's close friend and SLHH's general counsel, became Womack's counsel; that Louis attended Womack's *Garcia* hearing to help establish the lack of a conflict of interest so that Fazande could continue to be Womack's attorney; and that Louis was very upset with Womack after Womack indicated that he wanted to consult with another lawyer regarding Fazande's possible conflicts of interest. After Louis denied hiring Womack or even knowing that Womack acted as a patient recruiter, the government was entitled to cross-examine Louis on the coincidence of Womack having Fazande as his attorney. Thus, the government could properly ask Louis about whether he had obtained Fazande as an attorney for Womack and whether he had tried to influence Womack's account of what transpired at SLHH, as that evidence demonstrated Louis's consciousness of guilt. *See United States v. Rocha*, 916 F.2d 219, 240–41 (5th Cir. 1990).

Further, Louis cannot prove prejudicial error, as the limited questions and evidence about Womack likely did not prejudice Louis. To the extent that Louis claims prejudice, not from the actual introduction of evidence but from the suggestions in the prosecutor's questions, the court instructed the jury that the lawyer's questions were not evidence and that its verdict must be based solely on the evidence. Courts should presume that jurors adhere to these instructions, especially in light of the limited nature of the references to Womack's death. *See United States v. Insaulgarat*, 378 F.3d 456, 463–64 (5th

Cir. 2004) (holding that any error in prosecutor's line of questioning was non-prejudicial where it was not the "focus" of the case and jury was instructed that attorneys' questions were not evidence); *see also United States v. Webster*, 162 F.3d 308, 324 (5th Cir. 1998) (noting that the court was obliged to assume that the jury followed the court's instructions).

Lastly, despite the initial mistrial, the overwhelming evidence of Louis's guilt demonstrates that he suffered no prejudice from the limited questioning about Womack's death. *See Allen v. Chandler*, 555 F.3d 596, 602–03 (7th Cir. 2009) (refusing to "draw any inference from [defendant's] initial mistrial, which could have been the result of a variety of circumstances that are irrelevant to our consideration of prejudice").

We AFFIRM.