# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-20650

United States Court of Appeals
Fifth Circuit

**FILED**

December 16, 2019

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

RIYAZ MAZKOURI, also known as Riaz Mazcuri,

      Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before SOUTHWICK, WILLETT, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

A jury convicted Dr. Riaz Mazcuri for his role in a massive conspiracy to commit healthcare fraud at Riverside General Hospital. The jury also convicted him of fraudulently billing Medicare by exploiting five nursing-home residents with severe dementia. Mazcuri challenges his conviction and sentence. We affirm.

I.

From 2006 to 2012, Mazcuri was the attending physician at two partial-hospitalization programs at Riverside General Hospital ("Riverside")—Riverside Central ("Central") and Devotions Care Solutions ("Devotions"). Partial-hospitalization programs are outpatient psychiatric services designed to provide intensive, daily treatment to patients who have been discharged

from inpatient treatment or who suffer from an acute exacerbation of a chronic mental disorder. Mazcuri orchestrated a conspiracy at these facilities to bill Medicare for unprovided or unnecessary services.

Count 1 of the indictment charged Mazcuri with conspiracy to commit healthcare fraud. At trial, Mazcuri's co-conspirator Regina Askew testified that Mazcuri admitted large numbers of patients to Central after speaking with them for only about five minutes. When he was in a rush, Mazcuri sometimes admitted patients after seeing them in a group or talking to them briefly on the sidewalk.

Kristen Behn Courtney, who worked as a van driver and technician at Central, testified that she picked up patients with Alzheimer's disease or other forms of severe dementia from a nursing home called Mission Care. She observed that those patients often had to be coaxed into entering her van because they didn't understand where they were going. Courtney also prepared Central's patients for "doctor days," when Mazcuri would visit the facility to see his patients. On those days, Mazcuri spent "maybe a minute, minute and a half," with each patient. He visited groups of patients in wheelchairs and never talked to them individually. Sometimes, Mazcuri left the facility without having seen all of his patients. Robert Crane, another co-conspirator, testified that similar practices occurred at Devotions. Askew, Courtney, and Crane were just a few of the many witnesses who testified about Mazcuri's role in the conspiracy.

Counts 2–6 of the indictment charged Mazcuri with aiding and abetting healthcare fraud involving five specific patients at the Mission Care nursing home. Mazcuri admitted these five patients to Central, but they all had severe dementia and could not have benefited from treatment. For example, the patient involved in Count 3 believed the year was 1938 when it was 2009 and thought he lived in a casino. When the Mission Care psychiatrist asked the

No. 18-20650

patient involved in Count 4 where she was, she responded, "October, October." Her dementia was so advanced that the psychiatrist recommended her for hospice care one year before Mazcuri authorized her treatment at Central. The patient involved in Count 5 had Alzheimer's and could not understand why a driver was picking her up from Mission Care each day. These patients' illnesses were so severe that they were not eligible for partial-hospitalization programs. But Mazcuri admitted them anyway and sent the bill to Medicare.

These were not the only patients with severe dementia that Mazcuri exploited. Courtney testified that Government's Exhibit 67 contained a list of patients with post-admission instructions such as, "Take off dementia" and "Take off Alzheimer's." She explained: "[I]f they had those diagnoses, they were not appropriate for the [partial-hospitalization] program. So, we had to take [them] off."

With respect to the five patients involved in Counts 2–6, Mazcuri personally billed Medicare for 382 visits, totaling $44,500, and Riverside billed Medicare for 2,713 days of services, totaling $1,555,100. Over the course of the conspiracy from 2006 to 2012, Mazcuri and Riverside together billed Medicare for $69,512,730.25. Medicare paid $22,922,199.91 on those claims.

A jury found Mazcuri guilty on all six counts. The district court calculated a final offense level of forty-three under the Sentencing Guidelines. That typically results in a recommendation of life in prison. But Mazcuri's counts each carried a maximum penalty of ten years. Under the Guidelines, that meant his recommended sentence was sixty years. U.S.S.G. § 5G1.2(d). The district court varied downward from the Guidelines recommendation and imposed a sentence of 150 months. It also ordered restitution of $22,922,199.91 and forfeiture of $500,000. Mazcuri timely appealed.

No. 18-20650

II.

Mazcuri challenges his conviction based on three alleged errors by the district court. He argues that these errors were so prejudicial that we must grant him a new trial. We reject each argument in turn.

A.

Mazcuri argues that the district court violated Federal Rule of Evidence 1006 when it admitted into evidence certain summary charts, marked as Government's Exhibits 93–97. Those exhibits summarize fraudulent activity found in two voluminous spreadsheets, Government's Exhibits 3 and 5. The summary charts show that Mazcuri sometimes billed more than twenty-four hours of services in a single day. For example, one chart shows that Mazcuri reported 58.9 hours of service for 106 patients on July 22, 2008.

Rule 1006 permits the use of "a summary, chart, or calculation to prove the content of voluminous writings" that "cannot be conveniently examined in court." The district court has broad discretion to admit these sorts of summary charts. *See Irons v. Aircraft Serv. Int'l, Inc.*, 392 F. App'x 305, 314 (5th Cir. 2010). The parties dispute whether Mazcuri preserved his Rule 1006 arguments in the trial court and hence whether plain-error review applies. *See Puckett v. United States*, 556 U.S. 129, 135 (2009); *United States v. Sanchez-Hernandez*, 931 F.3d 408, 410–11 (5th Cir. 2019). We need not resolve the disagreement, however, because Mazcuri's arguments are meritless under any standard of review.

First, Mazcuri is wrong to claim that the Government should have disclosed the summary charts earlier. Rule 1006 says that a chart's "proponent must make the originals or duplicates available . . . at a reasonable time and place." But the rule says nothing about when the summary chart itself must be disclosed to other parties. *See, e.g., Colón-Fontánez v. Municipality of San Juan*, 660 F.3d 17, 30 (1st Cir. 2011); *United States v. Bakker*, 925 F.2d 728,

No. 18-20650

736 (4th Cir. 1991); *Coates v. Johnson & Johnson*, 756 F.2d 524, 550 (7th Cir. 1985). Mazcuri's argument about the timing of the charts' disclosure has no basis in Rule 1006, so we reject it.

Second, Mazcuri cannot challenge the summary charts on the basis that they included claims submitted by Cadwalder Behavioral Clinics. We have held that for Rule 1006, the "essential requirement is not that the charts be free from reliance on any assumptions, but rather that these assumptions be supported by evidence in the record." *United States v. Armstrong*, 619 F.3d 380, 384 (5th Cir. 2010) (quoting *United States v. Buck*, 324 F.3d 786, 791 (5th Cir. 2003)). Here, there is no dispute that the summary charts accurately reflect the claims data in Exhibits 3 and 5. And the Government proved at trial that Mazcuri was the medical director for Cadwalder and had submitted bills using Cadwalder's provider number. If Mazcuri nonetheless thought the particular presentation of otherwise-accurate information was "terribly misleading," his proper objection sounded in Rule 403, not Rule 1006.[1]

B.

Mazcuri next argues that the district court should not have admitted into evidence the criminal convictions of his co-conspirators. Mazcuri says the information is either irrelevant or unduly prejudicial. *See* FED. R. EVID. 402, 403. We review the district court's evidentiary rulings for abuse of discretion.

---

[1] Even if the district court erred, it would be harmless. *See United States v. Spalding*, 894 F.3d 173, 186 (5th Cir. 2018); *United States v. Winn*, 948 F.2d 145, 159 (5th Cir. 1991). All four of the *Winn* factors are present here: (1) the charts were based on data in two spreadsheets that the court admitted into evidence; (2) the Government made the underlying spreadsheets available to the defense well in advance of the trial; (3) the FBI agent who prepared the summaries testified at trial and the defense cross-examined him on issues that mirror Dr. Mazcuri's issues on appeal; and (4) the court gave the jury a proper limiting instruction, which stated: "Certain charts and summaries have been received into evidence. These charts and summaries have been admitted solely as an aid to help explain the facts disclosed by other exhibits in the case. You should give them only such weight as you think they deserve." Our Court has previously endorsed similar instructions. *See Spalding*, 894 F.3d at 186 n.18; *United States v. Whitfield*, 590 F.3d 325, 365 n.29 (5th Cir. 2009).

*United States v. Lewis*, 796 F.3d 543, 545 (5th Cir. 2015). Any mistakes are subject to harmless-error review. *United States v. Yanez Sosa*, 513 F.3d 194, 201 (5th Cir. 2008).

Mazcuri's co-conspirators, Askew and Crane, testified at trial about Mazcuri's healthcare-fraud conspiracy. Over the defense's objections, the district court allowed both of them to testify that they were convicted for their roles in the conspiracy and were cooperating with the Government to receive a potentially favorable sentencing recommendation. A witness-accomplice's guilty plea may generally be admitted into evidence if it serves a legitimate purpose and a proper limiting instruction is given. *See United States v. Valuck*, 286 F.3d 221, 228 (5th Cir. 2002). Legitimate purposes include blunting the potential effects of impeachment and clarifying the nature of the arrangement between the Government and the witness for purposes of determining credibility. *See id.* at 228–29.

Both of those legitimate purposes exist here. And the court gave the jury an appropriate limiting instruction:

> You have been told that the witnesses Regina Askew and Robert Crane were convicted of conspiracy to commit healthcare fraud and paying kickbacks. A conviction is a factor you may consider in deciding whether to believe that witness, but it does not necessarily destroy the witness's credibility. It has been brought to your attention only because you may wish to consider it when you decide whether you believe the witness's testimony. It is not evidence of the defendant's guilt or anything else.

The district court did not abuse its discretion by admitting evidence of the convictions of Askew and Crane.

Mazcuri also challenges the admissibility of the convictions of three co-conspirators who did not testify at trial: Mohammad Khan, Earnest Gibson III, and Earnest Gibson IV. We have previously noted that admitting such convictions can be "troubl[ing]." *United States v. Ramos-Cardenas*, 524 F.3d

600, 611 (5th Cir. 2008) (per curiam). As in *Ramos-Cardenas*, however, we need not determine whether the district court erred. Here, as there, the Government produced "substantial evidence of the defendants' guilt, as recounted earlier." *Ibid.* Therefore, any error was harmless.

## C.

Mazcuri's final guilt-phase argument is that the district court erred when it issued a jury instruction on deliberate ignorance for Count 1, which charged him with conspiracy to commit healthcare fraud. We review jury instructions for abuse of discretion, affording substantial latitude to the district court in describing the law to the jury. *United States v. Wright*, 634 F.3d 770, 774 (5th Cir. 2011). Our task is to assess whether the district court's charge was a correct statement of the law applicable to the factual issues confronting the jury. *United States v. Conner*, 537 F.3d 480, 486 (5th Cir. 2008). The district court may not instruct the jury on a charge the evidence does not support, but we view the evidence in the light most favorable to the Government. *See ibid.*

A deliberate-ignorance instruction informs the jury "that it may consider evidence of the defendant's charade of ignorance as circumstantial proof of guilty knowledge." *United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990). It is appropriate when "the evidence shows (1) subjective awareness of a high probability of the existence of illegal conduct, and (2) purposeful contrivance to avoid learning of the illegal conduct." *United States v. Threadgill*, 172 F.3d 357, 368 (5th Cir. 1999). Even if the district court erred by instructing the jury on deliberate ignorance, substantial evidence of actual knowledge would render any error harmless. *United States v. St. Junius*, 739 F.3d 193, 204–05 (5th Cir. 2013).

In this case, knowledge is an essential element of the crime of healthcare fraud, 18 U.S.C. § 1347, and Mazcuri denied knowledge of the Riverside fraud.

No. 18-20650

The Government put on substantial evidence showing that if Mazcuri lacked such knowledge, he at least acted with deliberate ignorance. Mazcuri certified patients for unnecessary services, including those with severe dementia who were ineligible for treatment. This included the patient who thought he lived in a casino and the other who answered "October, October" when asked where she was. Mazcuri's role in the fraud was so important that Khan told staff at Riverside to "make sure that he stayed happy because we had to have the signatures." And even after it was brought to Mazcuri's attention that his patients were not appropriate for partial-hospitalization programs, Mazcuri continued to certify them improperly without inquiring further. The district court did not abuse its discretion in issuing a jury instruction on deliberate ignorance.[2]

## III.

We now turn to Mazcuri's sentencing arguments. He raises three challenges to the district court's calculation of his recommended sentence under the Guidelines. He also challenges the court's calculations of restitution and forfeiture. We review and reject each argument in turn.

## A.

Mazcuri challenges the calculation of his offense level. The district court said it was forty-three. Mazcuri says it should have been thirty-one. He reaches that conclusion by challenging the factual basis for his sentence. In such a challenge, we ask whether the district court relied on "clearly erroneous facts." *Gall v. United States*, 552 U.S. 38, 51 (2007). A factual finding is clearly erroneous only if, after reviewing the entirety of the evidence, we have a definite and firm conviction that the district court erred. *United States v. Mata*,

---

[2] And in all events, any error was harmless because the Government introduced substantial evidence of Mazcuri's actual knowledge. *St. Junius*, 739 F.3d at 204–05.

624 F.3d 170, 173 (5th Cir. 2010). The district court's factual findings at sentencing need only be found by a preponderance of the evidence. *United States v. Dinh*, 920 F.3d 307, 310 (5th Cir. 2019).

"Generally, a PSR 'bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations.'" *United States v. Sparks*, 941 F.3d 748, 756 (5th Cir. 2019) (quoting *United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012) (per curiam)). A district court may adopt facts contained in the PSR "without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable." *Harris*, 702 F.3d at 230 (quotation omitted).

1.

Mazcuri first challenges the loss amount. Section 2B1.1(b)(1) of the Guidelines provides for an increase in offense level based on the amount of financial loss caused by the defendant's fraud. The Guidelines "emphasize the deference that must be shown to the sentencing judge, who is in a unique position to assess the applicable loss." *United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012). The sentencing judge "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C).

Application Note 3 states that the applicable loss amount is "the greater of actual loss or intended loss." *Id.* § 2B1.1 cmt. n.3(A); *see United States v. Harris*, 821 F.3d 589, 602 (5th Cir. 2016); *United States v. Valdez*, 726 F.3d 684, 696 (5th Cir. 2013). For healthcare fraud, the amount fraudulently billed to Medicare is *prima facie* evidence of the intended loss, though it is not conclusive, and the parties may introduce evidence to suggest that the amount billed overstates or understates the billing party's intent. *See United States v. Isiwele*, 635 F.3d 196, 203 (5th Cir. 2011).

When fraud is so pervasive that separating legitimate from fraudulent conduct "is not reasonably practicable," "the burden shifts to the defendant to make a showing that particular amounts are legitimate." *Hebron*, 684 F.3d at 563. In the absence of such evidence from the defendant, "the district court may reasonably treat the entire claim for benefits as intended loss." *Ibid.*; *see also United States v. Ezukanma*, 756 F. App'x 360, 371–74 (5th Cir. 2018) (per curiam); *United States v. Murthil*, 679 F. App'x 343, 352 (5th Cir. 2017) (per curiam); *United States v. St. John*, 625 F. App'x 661, 668 (5th Cir. 2015) (per curiam); *United States v. Age*, 614 F. App'x 141, 144 (5th Cir. 2015) (per curiam); *United States v. Martin*, 555 F. App'x 358, 368–69 (5th Cir. 2014) (per curiam).

We are persuaded that this is a case where the fraud is so pervasive that separating legitimate from fraudulent conduct is not reasonably practicable. The PSR's distillation of the facts shows that Mazcuri conspired to commit extensive Medicare fraud from 2006 to 2012. The district court found as a matter of fact that Mazcuri oversaw the "systematic manipulation" of hundreds of vulnerable patients, "who were fraudulently committed to inpatient treatment" at Central and Devotions for no other purpose than to generate revenue. Given the reliable evidence of extensive fraud, Mazcuri bears the burden of showing which portions of the claims are legitimate. *Hebron*, 684 F.3d at 563.

The PSR calculated an intended loss of $69,512,730.25 based on the amount Mazcuri and Riverside billed to Medicare. Using that loss amount, the PSR calculated an offense level of forty-seven. The district court nevertheless used only the actual loss paid out by Medicare, which was $22,922,199.91. This resulted in an offense level of forty-three, which is still high enough to lead to the longest possible sentencing recommendation under the Guidelines.

No. 18-20650

Mazcuri argues at least some of the money paid by Medicare was not based on fraud. He contends we should look at only the actual loss resulting from the five patients with severe dementia involved in Counts 2–6. He says that if we look at only these five patients, the actual loss to Medicare is $536,326.

We disagree. The district court could have used the $69,512,730.25 intended loss. *See* U.S.S.G. § 2B1.1, cmt. n.3(A). Mazcuri has not shown that the district court's decision to use less than one-third of that amount resulted in an unreasonable estimate of the loss. *See id.* § 2B1.1 cmt. n.3(C). After reviewing Mazcuri's arguments and the record, we are not left with a definite and firm conviction that the district court erred.

2.

Next, Mazcuri says his fraud did not involve ten or more victims. Under § 2B1.1(b)(2)(A)(i) of the Guidelines, fraud involving ten or more victims requires a two-point increase in offense level. Application Note 4(E) states that "in a case involving means of identification," a "victim" includes "any individual whose means of identification was used unlawfully or without authority." U.S.S.G. § 2B1.1 cmt. n.4(E). Our Court has held that Application Note 4(E) can apply in a Medicare-fraud case and that individuals whose identities are used to file fraudulent claims are "victims" for purposes of § 2B1.1(b)(2). *See United States v. Ainabe*, 938 F.3d 685, 689 (5th Cir. 2019); *United States v. Kalu*, 936 F.3d 678, 683 (5th Cir. 2019); *United States v. Barson*, 845 F.3d 159, 167 (5th Cir. 2016) (per curiam).[3]

---

[3] Some of our colleagues have questioned whether Application Note 4(E) is appropriate for Medicare-fraud cases. In a partial dissent in *Barson*, Judge Jones argued that in such cases, the "victim" for § 2B1.1(b)(2) is the Government rather than the individuals whose identities were used to fraudulently bill the Government. 845 F.3d at 168–70 (Jones, J., concurring in part and dissenting in part). This approach makes sense, given that § 2B1.1(b)(2) follows § 2B1.1(b)(1), and the loss calculation for § 2B1.1(b)(1) is based on the

No. 18-20650

Mazcuri contends the record reveals only six victims—the five individuals with severe dementia involved in Counts 2–6, plus the United States. Mazcuri did not raise this objection in the trial court, so we review his forfeited objection for plain error. *See Sanchez-Hernandez*, 931 F.3d at 410–11.

The reliable evidence summarized in the PSR provides ample basis to find by a preponderance of the evidence that, of the nearly 1,000 patients for whom Mazcuri filed claims, at least ten of them were victims of his fraudulent scheme. Defense counsel practically conceded as much at the sentencing hearing about the loss calculation:

> I don't think we can extrapolate from five to everyone, and so there is another way to do it. The—all five of these patients came from [Mission Care,] one pretty crummy nursing home in Houston. There were a total of 36 patients from that nursing home.
>
> *     *     *
>
> And so I think that when you can't determine loss, we look at gain, gain to Dr. Mazkouri; and I'm sorry it was so late, but we finally figured out what his particular gain was from treating all 36 patients.
>
> *     *     *
>
> He made $60,000 treating all of the patients from that nursing home. If you include all the money that Riverside made on all of those 36 patients, you come up with $1.5 million.

It was not plain error for the district court to conclude that there were 10 or more victims.

---

amount of money fraudulently billed to Medicare. Judge Jones also noted that, depending on the facts of the case, it may be implausible to describe the individuals whose identities were used to bill Medicare as "victims" of identity theft. For example, in *Barson*, some of the alleged beneficiaries were paid kickbacks. *Id.* at 169. Judge Jones argued that these individuals were more appropriately described as co-conspirators than victims. *Ibid.* Judge Dennis recently echoed Judge Jones's concerns in *Ainabe*. 938 F.3d at 693–95 (Dennis, J., specially concurring). Of course, our case is different from *Barson* because the Mission Care residents could reasonably be characterized as victims given the abhorrent way Mazcuri manipulated them for financial gain. Regardless, we are bound by our Court's precedents in *Barson, Kalu*, and *Ainabe*, which hold that individuals whose identities are used to fraudulently bill the Government are "victims."

No. 18-20650

3.

Mazcuri also says his case does not involve a "large number" of "vulnerable victims." The Guidelines impose a two-point offense-level increase when "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). A "vulnerable victim" is defined as "a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct)," who is "unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." *Id.* § 3A1.1 cmt. n.2. An additional two-point increase applies if the offense involved a "large number" of vulnerable victims. *Id.* § 3A1.1(b)(2). The district court found that Mazcuri harmed a "large number" of "vulnerable victims" and increased his offense level by four points.

Mazcuri argues on appeal that there wasn't a "large number" of vulnerable victims because the Government could show only five vulnerable victims—the five individuals with severe dementia involved in Counts 2–6. He does not argue that his victims weren't "vulnerable," so he disputes only two of the four points added to his offense level under § 3A1.1(b).[4]

The Guidelines do not define what constitutes a "large number" for purposes of § 3A1.1(b)(2). *See United States v. Kaufman*, 546 F.3d 1242, 1268–

---

[4] As with the "ten or more victims" provision, § 3A1.1(b) raises questions about whether patients in a Medicare-fraud case can be characterized as "victims." *See supra* note 3. Circuit precedent tells us that they can. In applying § 3A1.1(b), our Court has "previously recognized that a physician's patients can be victimized by a fraudulent billing scheme." *Valdez*, 726 F.3d at 693 (quotation omitted). Our precedents distinguish between fraud schemes that benefit patients and those that harm them. *Ibid.* Examples of harm include keeping patients in medical facilities unnecessarily or subjecting them to unnecessary treatments. *Ibid.* Patients that are harmed count as victims for § 3A1.1(b). *Ibid.* In this case, defense counsel conceded at sentencing that Mazcuri provided unnecessary treatment to Mission Care nursing-home patients with severe dementia. Those patients are victims under § 3A1.1(b).

13

69 (10th Cir. 2008). But *Valdez* affirmed a finding of a "large number" of vulnerable victims in a healthcare-fraud case without addressing the minimum threshold for a "large number." 726 F.3d at 694. We adopt the same approach here. Given the pervasiveness of Mazcuri's fraud and the defense's concession that Mazcuri exploited at least thirty-six nursing-home patients, we hold that the district court reasonably found Mazcuri responsible for harming a "large number" of vulnerable victims.

## B.

Finally, we review the district court's calculations of restitution and forfeiture. "The Government bears the burden to establish amounts for restitution and forfeiture, at which point the burden shifts to the defendant to prove the inaccuracy of the loss calculation." *United States v. Dickerson*, 909 F.3d 118, 129–30 (5th Cir. 2018) (footnotes omitted), *cert. denied*, 139 S. Ct. 2685 (2019). We review the district court's factual findings for clear error. *See United States v. Fisch*, 851 F.3d 402, 412 (5th Cir. 2017) (forfeiture); *United States v. Read*, 710 F.3d 219, 231 (5th Cir. 2012) (per curiam) (restitution).

The Mandatory Victims Restitution Act requires restitution not exceeding the "actual loss directly and proximately caused by the defendant's offense of conviction." *United States v. Sharma*, 703 F.3d 318, 323 (5th Cir. 2012). In this case, the district court ordered restitution equal to the actual loss to Medicare, $22,922,199.91. That is the same figure it used in its loss calculation for § 2B1.1(b)(1). Mazcuri's challenge to the restitution order mirrors his challenge to the loss calculation. We reject this argument here for the same reasons we did there. *See supra* Part III.A.1.

Turning to criminal forfeiture, we have held that forfeiture in a healthcare-fraud case under 18 U.S.C. § 982(a)(7) is limited to the property the defendant acquired as a result of the crime. *United States v. Sanjar*, 876 F.3d 725, 749 (5th Cir. 2017). In this case, the district court imposed a personal

money judgment of $500,000, but it did not elaborate on its method for calculating that figure. Nevertheless, we can affirm on any ground supported by the record. *See United States v. Castaneda-Lozoya*, 812 F.3d 457, 460 (5th Cir. 2016).

In its sentencing memorandum before the trial court, the Government noted that Mazcuri admitted to personally receiving $2,421,604 from Medicare for claims involving Riverside patients. The Government then "conducted its own calculation to confirm that number," and arrived at a "conservative measure" of $1,126,775.46. In a revised sentencing memorandum, Mazcuri claimed that he received only $892,155. Having reviewed these calculations, we conclude that the district court's order of $500,000 is, if anything, an underestimate of the amount Mazcuri personally gained from his fraud. Numerous cases have upheld reasonable estimates for calculating criminal forfeiture. *See, e.g.*, *United States v. Ayika*, 837 F.3d 460, 467–68 (5th Cir. 2016); *United States v. Bogdanov*, 863 F.3d 630, 634 (7th Cir. 2017); *United States v. Vilar*, 729 F.3d 62, 95–96 (2d Cir. 2013); *United States v. Iacaboni*, 363 F.3d 1, 7 (1st Cir. 2004). The district court did not clearly err in its forfeiture calculation.

\* \* \*

Mazcuri's conviction and sentence are AFFIRMED.