# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 9, 2020

Lyle W. Cayce
Clerk

No. 18-50979

United States of America,

*Plaintiff—Appellee*,

*versus*

Geoffrey Comstock,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 5:16-CR-708-1

Before King, Graves, and Oldham, *Circuit Judges*.
Andrew S. Oldham, *Circuit Judge*:

Geoffrey Comstock's company contracted with the City of San Antonio to provide janitorial services at the Alamodome. When the City initiated a compliance review, Comstock ordered his employees to fabricate time sheets to justify his company's billings. His employees panicked, and one of them contacted federal authorities. After an extensive federal investigation and trial, the jury convicted Comstock of conspiracy to commit wire fraud and six counts of aiding and abetting wire fraud. Comstock appealed. We affirm.

No. 18-50979

I.

Comstock was the owner of a company named Frio Nevado. Frio held the City of San Antonio's contract for janitorial services at the Alamodome. Frio received a monthly fee for management services and was paid hourly for janitorial work. Prior to Alamodome events, a city employee named T.G. Knappick would send a work order to Frio estimating the personnel and hours needed for the event. Frio was supposed to invoice the City for the number of hours that were *actually* worked by its janitorial staff. Instead, Frio intentionally billed the City for the entire amount in the work order's estimate, even though Frio delivered fewer hours of actual work.

Comstock instructed Marcelino Garza, operations manager at Frio, to "try to save hours." Based on Comstock's orders, Garza told workers who were slated to work eight-hour shifts to work only "six-and-a-half hours or . . . seven hours, no more than that." He would then "stagger" the shifts of workers so that "there would always be coverage throughout the day." Comstock told Garza not to adjust the invoices to reflect the number of hours actually worked. As Garza described it:

> After every event, I would always tell Mr. Comstock how many hours were used and what they gave us and how many were saved, so he knew the whole time. Like again, for instance, if they gave us a thousand hours and we used 500, he knew what it was and then we still billed a thousand hours.

According to Garza, this "happened all the time." Furthermore, "Mr. Comstock said never to talk about the hours to T.G.," the city employee who sent pre-event estimates to Frio. When asked whether Comstock and Frio submitted false invoices, Garza answered, "Yes sir."

In July 2015, the City's Finance Department initiated a compliance review of Frio's 2014 contract. The City chose to review the contract because

of its financial size and visibility to the public. The City asked for time sheets to back up a sample of Frio's invoices. Pandemonium ensued.

Comstock's assistant, Clarence Al Hughes, worked on Frio's production of documents to the City. Hughes was the person who installed Frio's timekeeping system at the Alamodome (called "uAttend"). But Comstock instructed Hughes and others to ignore the timecards generated by uAttend and "to basically create new ones." So Hughes and others working for Comstock fabricated time sheets by "using names from the uAttend system plus [some names that] were made up entirely." Then they split up the hours of some workers "and move[d] them onto another event."

Comstock also directed Gabrielle Lopez, Hughes's wife, "to create an Excel spreadsheet that looked like a time sheet that we would have used, so we could submit that to the City of San Antonio for the audit." According to Lopez, Frio's payroll records "weren't kept very well and they didn't correspond to what was on the invoice that was submitted to the City of San Antonio." Sometimes the payroll documents were missing altogether, so Lopez "proceeded to go off of the only kind of documentation [she] had, which was on uAttend." The uAttend records eventually became her "sole focus." Those records showed the names of workers who staffed events and the number of hours they worked. But, according to Lopez, the records "didn't match" Frio's billings. "They were different [in] that [fewer] work hours were actually [logged] on the uAttend system than what was being billed."

When Lopez told Comstock about this discrepancy, he told her "to create these time sheets and to make it reflect like the work order did; however, we couldn't make it look too perfect. It couldn't be right on the dot; maybe a few hours off [to] look better." After Lopez created each time sheet, Comstock "would look at it" to make sure it wasn't "too perfect." Lopez

found fabricating time sheets "very confusing" because there were "so many names on that list of all of the employees that worked there, and it was very difficult trying to make sure that some person didn't work an exorbitant [number of hours], you know, that they worked from 6 [o'clock in] the morning till 12 o'clock at night." "Having to work with all of the invoices and making sure they aligned well, it was very, very difficult."

As Lopez began to realize what Comstock was asking her to do, she panicked:

> I was panicking[] because I was being asked to create these—I was being asked to create these documents, which were false. They were not true, because what was true was what I had on the uAttend records. That was what we used as far as our hours. That was what we had on our records and I was being asked to supply the City of San Antonio with something completely different.

Lopez's husband, Hughes, contacted the Department of Homeland Security in August 2015 to report Frio's fraud. Hughes explained, "I was getting very concerned, [so] I decided that I was going to go the path of recording conversations. . . . [I was afraid] of not really being able to defend against whatever was happening." During his first meeting with the Government, Hughes provided two audio recordings of conversations at Frio. Afterwards, Hughes provided additional recordings.

In one recording, Comstock's employee and co-defendant Anna Becerra can be heard telling Hughes and Lopez: "This is what I said all along. You can't do this. You have to bill hour per hour." Ex. 68B at 1:10.[1] A few

---

[1] The Government submitted the audio recordings as exhibits at trial. On appeal, the Government submitted audio recordings with synchronized transcripts. To the extent our quotations differ slightly from the transcripts, those differences are based on our independent review of the audio.

No. 18-50979

minutes later, she stated, "We're all going to be put in f[* * *]ing jail." *Id.* at 4:59. Becerra also described Frio's practice of "ghost billing," which "is when you bill someone for people you did not have there, and you make a profit off of it." *Id.* at 5:22.

In another recording, Comstock can be heard talking to Becerra, Hughes, and Lopez about how to fabricate time sheets. Comstock tried to justify Frio's lack of time sheets by stating, "From Day 1, every manager in that facility has said we don't care about your hours." Ex. 71B at 5:30. Hughes responded, "But see that's an off-record conversation," to which Comstock replied, "Yeah, I know." Afterwards, Becerra can be heard stating:

> They're not going to let you bill because if that—if that was true, we would just do our time sheet from here, turn it in, and say, "Hey, okay, we are supposed to have 100 people. We had 10. So thank you." That's—they're not going to accept that. They're going to say in the future, you can't do that. That's—that you can't do it.
>
> * * * *
>
> Yeah, either way, we're screwed because if they change it in the future, [then] in the future we just have to bring in 100 people. I mean it's just going to bring—bring in whoever they say bring in. Right now, we're on a budget. Like right now, I argue with Marcelino, and, and, and, and Mario all the time. They're like, hey, uh-uh, they said to bring in the people at— no, bring them in an hour later. Bring half the people in two hours later. Bring the—send the other ones home early. You know, you have to play the system in order for us to make money. This contract was not set up for us to make money if they want us to run it the way it's—it's being run.

*Id.* at 6:00–6:52.

No. 18-50979

In another recording, Becerra can be heard telling Hughes and Lopez: "[T]hat's fraud. Y'all are falsifying documents that are going to a city. I'm sorry." Ex. 72B at 3:23. Becerra also said, "I told her in front of him as long as you, I, and you know what we're doing is wrong. You can lie to everybody else. We know what we're doing is wrong. And I told him that. I told him." *Id.* at 4:10. "We know legally it is wrong," she reiterated. *Id.* at 4:31. Later in the conversation, Becerra can be heard stating:

> He said that, quote/unquote, unwritten agreement. We can do that. I said there's no f[* * *]ing unwritten agreement. I said I'm sorry. I got f[* * *]ing pissed. I said because he knows we're doing wrong, and he's allowing it.
>
> * * * *
>
> No, there's no f[* * *]ing unwritten agreement. I don't care what the f[* * *] y'all say. You can't f[* * *]ing do that . . . . That's f[* * *]ing fraud. We did it for years. But you know what? We, as a group and as a company, have to stand together to make sure that this—that we all have the same story.

*Id.* at 12:05–13:10.

Federal agents executed a warrant to search Frio's offices and seize records related to Frio's allegedly fraudulent billing practices. The Department of Homeland Security subsequently provided the City with Frio's uAttend timekeeping records so they could calculate the extent to which Frio had overbilled the City. The City estimated that Frio had overcharged it by $558,102.47 from June 23, 2014, to October 8, 2015.

The Government charged Comstock with conspiracy to commit wire fraud and six counts of aiding and abetting wire fraud. At his trial, Comstock's defense theory was that he had an unwritten agreement with the

City to bill on a budgetary basis, or at least he subjectively believed this was the case. The jury found Comstock guilty on all counts.[2]

At the sentencing hearing, the district court received evidence of the City's losses. The Pre-Sentence Report ("PSR") adopted the City's estimate of $558,102.47. The defense called Andrew Barbe, an accounting expert, who presented several criticisms of the City's estimate. In response to those criticisms, the City revised its loss estimate to $448,454.11. Comstock then testified that even after the revisions, he deserved an additional credit of "about $89,000." The district court took the City's revised calculation, granted Comstock the credit he requested, and arrived at a loss calculation of $358,464.11.

Using that loss amount in its application of U.S.S.G. § 2B1.1(b)(1), the district court calculated an advisory Guidelines range of thirty-seven to forty-six months in prison. Varying down from the Guidelines, it sentenced Comstock to twenty-five months in prison and three years of supervised release. It then offered to hold an additional hearing on restitution, but neither the Government nor Comstock asked for one. So the court ordered Comstock to pay $358,464.11 in restitution. Comstock timely appealed, challenging both his convictions and his sentence.

## II.

Comstock raises two challenges to his convictions. First, he argues that his convictions are not supported by sufficient evidence. Second, he argues that the district court erred by refusing to issue two jury instructions he requested. We consider and reject both of these arguments in turn.

---

[2] The Government also charged Becerra with the same crimes, and she was tried as Comstock's co-defendant. Her defense theory blamed Comstock for the fraudulent billings. The jury acquitted Becerra.

A.

We begin with Comstock's challenge to the sufficiency of the evidence for his convictions. We must affirm his convictions if any rational trier of fact could have found the essential elements of the crimes proven beyond a reasonable doubt. *See United States v. del Carpio Frescas*, 932 F.3d 324, 328 (5th Cir. 2019) (per curiam).

The elements of wire fraud are: "(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *United States v. Spalding*, 894 F.3d 173, 181 (5th Cir. 2018) (quotation omitted). A conspiracy to commit wire fraud under 18 U.S.C. § 1349 occurs when: "(1) two or more persons agreed to commit fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined the agreement with the intent to further the unlawful purpose." *United States v. Beachum*, 774 F.3d 267, 272 (5th Cir. 2014). Aiding and abetting occurs when the defendant "aids, abets, counsels, commands, induces[,] or procures" the commission of a federal offense. 18 U.S.C. § 2(a).

The evidence adduced at trial is easily sufficient to support Comstock's convictions. Garza testified that Comstock routinely overbilled the City by having his staff produce false invoices that did not accurately reflect the number of hours of janitorial work that Frio provided. And the Government's trial exhibits documented wire transfers that the City made to Frio (including the transfers involved in the six counts of aiding and abetting) based on Frio's false invoices.

Comstock argues on appeal that Frio's billing practices were authorized by an unwritten agreement, or at least he believed they were. But Garza, Hughes, and Lopez all testified that when the City initiated its compliance review of Frio's contract, Comstock instructed them to fabricate

false time sheets and submit them to the City in order to conceal Frio's overbillings. The audio recordings introduced by the Government corroborate that testimony. This evidence provided a rational jury with more than sufficient grounds to conclude that Comstock did not sincerely believe he had a legitimate, unwritten agreement with the City.

B.

We next consider Comstock's argument that the district court erred by failing to issue two jury instructions he requested. Our review is for abuse of discretion. *See United States v. Davis*, 132 F.3d 1092, 1094 (5th Cir. 1998). To prevail under this standard, Comstock "must demonstrate that his requested instructions were (1) correct statements of the law, (2) not substantially covered in the charge as a whole, and (3) of such importance that the failure to instruct the jury on the issue seriously impaired the defendant's ability to present a given defense." *Ibid.* (quotation omitted). District courts have "great latitude" in deciding whether to include or omit jury instructions. *United States v. Kay*, 513 F.3d 432, 447 (5th Cir. 2007) (quotation omitted).

Comstock argues that the district court should have given a five-paragraph jury instruction stating, in essence, that good faith is a complete defense to the charges against him because it is "inconsistent with criminal intent." We find that the judge's jury instructions substantially covered Comstock's good-faith defense because they accurately described the intent requirements for the charges against him. Furthermore, Comstock was allowed to argue at trial that he acted in good faith according to an unwritten agreement that abandoned hourly billing, so his ability to present his defense was not seriously impaired. Comstock has therefore failed to show an abuse of discretion.

Comstock also argues that the district court should have given the following "defensive theory of the case" instruction:

> It is a defense theory that _____.
>
> If the defendant's theory of the case causes you to have a reasonable doubt as to any element that the government is required to prove beyond a reasonable [doubt], then you shall find the defendant not guilty.

The legal requirement for such an instruction, Comstock says, comes from *Mathews v. United States*, 485 U.S. 58 (1988). *Mathews* noted the "general proposition" that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Id.* at 63.

*Mathews* is inapposite. The written instruction that Comstock submitted to the district court contained only a blank space with no defense theory at all. True, defense counsel objected to the judge's proposed instructions because they omitted the defense's theory that "there has been waiver among the parties and there's some Texas state contract provisions that are applicable to the analysis that the jury should consider." But counsel did not identify these purported "Texas state contract provisions" or propose any language for the instruction. Even on appeal, Comstock has not identified any applicable provisions of state law or proposed any language for the instruction. The district court did not abuse its discretion in refusing to give Comstock's fill-in-the-blank instruction.

## III.

Comstock also raises two challenges to his sentence. First, he argues that the district court erred in its loss calculation. Second, he argues that the district court erred in relying on that same loss calculation for its restitution order. We consider and reject both of these arguments in turn.

A.

Comstock argues that the district court erred in its application of U.S.S.G. § 2B1.1(b)(1) by miscalculating the loss caused by his fraud. In evaluating a challenge to the factual basis of a district court's Guidelines calculation, we must affirm the sentence unless the court relied on "clearly erroneous facts." *Gall v. United States*, 552 U.S. 38, 51 (2007). "A factual finding is clearly erroneous only if, after reviewing the entirety of the evidence, we have a definite and firm conviction that the district court erred." *United States v. Mazkouri*, 945 F.3d 293, 303 (5th Cir. 2019). "The district court's factual findings at sentencing need only be found by a preponderance of the evidence." *Ibid.*

Section 2B1.1(b)(1) calls for an offense-level increase based on the financial loss caused by the defendant's fraud. Application Note 3 states that the loss amount is "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1 cmt. n.3(A); *see also Mazkouri*, 945 F.3d at 303–04. The sentencing judge "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). Because the "sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence[,] . . . the court's loss determination is entitled to appropriate deference." *Ibid.*; *see also, e.g.*, *United States v. De Nieto*, 922 F.3d 669, 674–75 (5th Cir. 2019); *United States v. Hebron*, 684 F.3d 554, 560 (5th Cir. 2012).

At trial, Dawn Opperman testified on behalf of the City of San Antonio that from June 23, 2014, to October 8, 2015, Frio overcharged it by $558,102.47. As the PSR noted, that amount is a "conservative" estimate of the actual loss because Frio's fraud likely started at the inception of the contract in 2002. But Opperman limited her initial loss estimate to the much shorter time period for which she had time-card data from uAttend. Then, in response to Comstock's expert report, the City made its loss estimate even

more conservative, revising it downward to $448,454.11. Then, in response to Comstock's request for an additional credit of "about $89,000," the district court made the loss estimate *even more* conservative, revising it downward *again* to $358,464.11.

Comstock offers no valid basis for challenging this triply conservative estimate of the loss amount. He claims that Frio was paid on a budgetary basis rather than an hourly basis; but the district court correctly rejected that argument as an attempt to relitigate Comstock's guilt. Comstock argues that his bank and payroll records provided better evidence of Frio's hours than uAttend did; but however imperfect the latter was, the former provided *zero* evidence of Frio's hours. (And trial evidence showed the payroll records were a complete mess and riddled with fraud, to boot.) Finally, Comstock quibbles with the average weighted hourly rate the City used for its loss estimates ($8.70); but the City based that rate on the actual "contract rates" for "each position," "whether it was [for] a supervisor, a cleaning person[,] or conversion [of the facility for events]." Comstock offers no persuasive basis for using a different rate.

The district court's estimate of the loss amount was aboundingly conservative. It was not clearly erroneous.

B.

Because Comstock defrauded the City of San Antonio, he must pay restitution under the Mandatory Victims Restitution Act. *See* 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii). Restitution is limited to the "actual loss directly and proximately caused by the defendant's offense of conviction." *Mazkouri*, 945 F.3d at 306 (quotation omitted). "We review the quantum of an award of restitution for abuse of discretion" and "review the district court's factual findings for clear error." *United States v. Sharma*, 703 F.3d 318, 322 (5th Cir. 2012). "Any dispute as to the proper amount or type of restitution shall be

resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e).

The district court ordered restitution of $358,464.11, which is identical to its loss calculation under U.S.S.G. § 2B1.1(b)(1). Prior to announcing its restitution order, the court offered to hold a separate restitution hearing, but neither the Government nor Comstock asked for one. Comstock's challenge to the restitution order involves the same arguments that he raised in his challenge to the district court's application of U.S.S.G. § 2B1.1(b)(1). We reject his challenge here for the same reasons we did there. *See Mazkouri*, 945 F.3d at 306.

AFFIRMED.